GIRARDI | KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017
Telephone (213) 977-0211
Facsimile (213) 481-1554
J. PAUL SIZEMORE, Alabama Bar No. ASB 9286 077J

Attorney for Plaintiffs, individually
and on behalf of all others similarly situated

RECEIVED

2007 AUG 22  P 12: 16

DEBRA P. HACKETT, CLK
U. S. DISTRICT COURT
MIDDLE DISTRICT ALA

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF ALABAMA

### NORTHERN DIVISION

| | | |
|---|---|---|
| S. Garrett Cook, Jr.,<br>Don Hall, | ) | CASE NO. 2:07cv 750 - WKW |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Plaintiffs, | ) | CLASS ACTION |
| | ) | |
| v. | ) | |
| | ) | |
| HESS CORPORATION; | ) | |
| CHEVRON USA, INC.; | ) | |
| CIRCLE K STORES, INC.; | ) | |
| CITGO PETROLEUM CORPORATION; | ) | |
| CONOCOPHILLIPS COMPANY; | ) | |
| COSTCO WHOLESALE CORPORATION; | ) | |
| EXXON MOBIL CORPORATION; | ) | |
| FLYING J, INC.; | ) | |
| MARATHON PETROLEUM COMPANY LLC; | ) | |
| MOTIVA ENTERPRISES, LLC; | ) | |
| MURPHY OIL USA, INC.; | ) | |
| PETRO STOPPING CENTERS, L.P.; | ) | |
| PILOT TRAVEL CENTERS LLC; | ) | |
| RACETRAC PETROLEUM, INC.; | ) | |
| SHELL OIL PRODUCTS COMPANY LLC; | ) | |
| SPEEDWAY SUPERAMERICA LLC; | ) | |
| SUNOCO, INC. R&M; | ) | |
| THE KROGER COMPANY; | ) | |

1

THE PANTRY, INC.;                                )
TOTAL PETROCHEMICALS USA, INC.;                  )
VALERO MARKETING AND COMPANY;                    )
WILCOHESS, LLC;                                  )
BP CORPORATION NORTH AMERICA, INC.;              )
             Defendants.    )
----------------------------------------------------------------)

## CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs S. Garrett Cook, Jr. and Don Hall, individually and on behalf of all other persons similarly situated, by undersigned attorneys, for their Complaint against Hess Corporation, Chevron USA, Inc., Circle K Stores, Inc., Citgo Petroleum Corporation, ConocoPhillips Company, CostcoWholesale Corporation, Exxon Mobil Corporation, Flying J, Inc., Marathon Petroleum Company LLC, Motiva Enterprises, LLC, Murphy Oil USA, Inc., Petro Stopping Centers, L.P., Pilot Travel Centers LLC, Racetrac Petroleum, Inc., Shell Oil Products Company LLC, Speedway SuperAmerica LLC, Sunoco, Inc. R&M, The Kroger Company, Total Petrochemicals USA, Inc., Valero Marketing and Company, WilcoHess, LLC, BP Corporation North America, Inc., allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action as a class action on behalf of themselves and on behalf of all other persons who purchased motor fuel from one or more of the Defendants in the State of Alabama when, at the time of purchase, the motor fuel was greater than 60 degrees Fahrenheit. During each such transaction, defendants delivered to plaintiffs and class members a smaller quantity of motor full than the quantity for which he or she was charged.

2.      Motor fuel is purchased for the energy output it provides. Recognizing that the

energy output of motor fuel is impacted by variations in temperature, the petroleum industry has

adopted as the standard unit of measurement for a gallon of petroleum: 231 cubic inches at 60

degrees Fahrenheit.  Notwithstanding the temperature component of this industry-wide standard,

defendants, among other things: (i) delivered to Plaintiffs and class members motor fuel

substantially in excess of 60 degrees Fahrenheit; (ii) failed to adjust the price charged or the

volume of motor fuel delivered to account for the corresponding decrease in energy; (iii)

misleadingly represented to Plaintiffs and class members that the motor fuel was being sold in

standard "gallon" units, when in fact Defendants ignored the temperature component of the

industry-wide definition of a gallon for petroleum products; (iv) concealed, suppressed and failed

to disclose a number of material facts in connection with their sale of "hot" motor fuel to

Plaintiffs and class members.

　　　　3.　　　　With warmer gas sold at the pump, Defendants collect more in taxes from

consumers based on the expanded volume of the gas. Instead of remitting such "taxes" to federal,

state, and local governments, the Defendants only remit taxes based on the volume of gasoline as

measured at 60 degrees Fahrenheit.

　　　　4.　　　　The Defendants have collected tens of millions of dollars in purported fuel "taxes"

from the Class which moneys have not been remitted to federal, state, and local governments.

This action seeks restitution and remedies on behalf of the Class of consumers who have

purchased fuel at gas stations owned and operated by Defendants in the State of Alabama.

Defendants continue these wrongful acts and practices, which have caused, and will continue to

cause, injury to Plaintiffs and class members.

**THE PARTIES**

3

5.    Plaintiff S. Garrett Cook, Jr. is a resident of Montgomery County. He is a citizen of Alabama, with address 135 Gilder Court, Pike Road, Alabama, 36064.

6.    Plaintiff has purchased hot motor fuel from one or more of the Defendants in this District and one or more of the Defendants have injured Plaintiff in the manner herein stated.

7.    Plaintiff Don Hall is a resident of Shelby County. He is a citizen of Alabama, with address 2051 Somerset Lane, Birmingham Alabama, 35242.

8.    Plaintiff has purchased hot motor fuel from one or more of the Defendants in this District and one or more of the Defendants have injured Plaintiff in the manner herein stated.

9.    Defendant Hess Corporation ("Hess") is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York.

10.    At all times relevant to this Complaint, Hess has been engaged in the sale of motor fuel in the State of Alabama and in this District under the Hess brand name.

11.    Defendant Chevron USA, Inc. ("Chevron") is a Pennsylvania corporation with its principal place of business in San Ramon, California. Its division Chevron Products Company is engaged in the sale of motor fuels throughout the United States.

12.    At all the times relevant to this Complaint, Chevron was engaged in the sale of motor fuel in the State of Alabama and in this District under the Chevron and Texaco brand names.

13.    Defendant Circle K Stores, Inc. ("Circle K") is incorporated under the laws of the State of Texas with its principal place of business in Tempe, Arizona.

14.    At all times relevant to this Complaint, Circle K was engaged in the sale of motor fuel in the State of Alabama and in this District under the Circle K brand name.

4

15.    Defendant Citgo Petroleum Corporation ("Citgo") is incorporated under the laws of the State of Delaware with its principal place of business in Houston, Texas.

16.    Citgo is a wholly owned operating subsidiary of PDV Holding, Inc.

17.    CITGO's ultimate parent is the national oil company of the Bolivarian Republic of Venezuela, Petroleos de Venezuela, S.A.

18.    At all times relevant to this Complaint, Citgo was engaged in the sale of motor fuel in the State of Alabama and in this District at Citgo and 7- Eleven locations under the Citgo brand name.

19.    Defendant ConocoPhillips Company ("Conoco") is incorporated under the laws of the State of Delaware, with its principal place of business in Houston, Texas.

20.    At all times relevant to this Complaint, Conoco was engaged in the sale of motor fuel in the State of Alabama and in this District.

21.    Defendant Costco Wholesale Corporation ("Costco") is incorporated under the laws of the State of Washington with its principal place of business in Issaquah, Washington.

22.    At all times relevant to this Complaint, Costco was engaged in the sale of motor fuel in the State of Alabama and in this District.

23.    Defendant Exxon Mobil Corporation ("Exxon Mobil") is a corporation organized under the laws of the State of New Jersey with its principal place of business in Irving, Texas.

24.    At all times relevant to this Complaint, Exxon Mobil has been engaged in the sale of motor fuel in the State of Alabama and in this District under the Exxon and Mobil brand names.

25.    Defendant Flying J, Inc. ("Flying J") is incorporated under, the laws of the State of

Utah with its principal place of business in Ogden, Utah.

26.     At all the times relevant to this Complaint, Flying J was engaged in the sale of motor fuel in the State of Alabama and in this District.

27.     Defendant Marathon Petroleum Company LLC ("Marathon") is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Findlay, Ohio.

28.     At all times relevant to this Complaint, Marathon was engaged in the sale of motor fuel in the State of Alabama and in this District.

29.     Defendant Motiva Enterprises LLC ("Motiva") is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Houston, Texas.

30.     At all times relevant to this Complaint, Motiva was engaged in the sale of motor fuel in the State of Alabama and in this District under the Shell and Texaco brand names.

31.     Defendant Murphy Oil Corporation ("Murphy") is incorporated under the laws of the State of Delaware with its principal place of business in El Dorado, California.

32.     At all times relevant to this Complaint, Murphy was engaged in the sale of motor fuel in the State of Alabama and in this District.

33.     Defendant Petro Stopping Centers, L.P. ("Petro") is formed under the laws of the State of Delaware and maintains its principal place of business in El Paso, Texas.

34.     At all times relevant to this Complaint, Petro was engaged in the sale of motor fuel in the State of Alabama and in this District.

35.     Defendant Pilot Travel Centers LLC ("Pilot") is formed under the laws of the

6

State of Delaware with its principal place of business in Knoxville, Tennessee.

36.    At all times relevant to this Complaint, Pilot was engaged in the sale of motor fuel in the State of Alabama and in this District.

37.    Defendant RaceTrac Petroleum Inc. ("RaceTrac") is formed under the laws of the State of Georgia with its principal place of business in Atlanta, Georgia.

38.    At all times relevant to this Complaint, RaceTrac was engaged in the sale of motor fuel in the State of Alabama and in this District.

39.    Defendant Shell Oil Products Company LLC ("Shell") is formed as a limited liability company under the laws of the State of Delaware with its principal place of business in Houston, Texas.

40.    At all times relevant to this Complaint, Shell was engaged in the sale of motor fuel in the State of Alabama and in this District under the Shell brand name.

41.    Defendant Speedway SuperAmerica LLC ("Speedway") is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Enon, Ohio.

42.    At all times relevant to this Complaint, Speedway was engaged in the sale of motor fuel in the State of Alabama and in this District under the Shell brand name.

43.    Defendant Sunoco, Inc. R&M ("Sunoco") is incorporated under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.

44.    At all times relevant to this Complaint, Sunoco was engaged in the sale of motor fuel in the State of Alabama and in this District under the Sunoco brand name.

45.    Defendant The Kroger Company ("Kroger") is incorporated under the laws of the

State of Ohio with its principal place of business in Cincinnati, Ohio.

46.    At all times relevant to this Complaint, Kroger was engaged in the sale of motor fuel in the State of Alabama and in this District at its Foodsco locations.

47.    Defendant Total Petrochemicals USA ("Total") is incorporated under the laws of the State of Delaware with its principal place of business in Dallas, Texas.

48.    At all times relevant to this Complaint, Total was engaged in the sale of motor fuel in the State of Alabama and in this District.

49.    Defendant Valero Marketing and Supply Company ("Valero") is incorporated under the laws of the State of Delaware with its principal place of business in San Antonio, Texas.

50.    At all times relevant to this Complaint, Valero was engaged in the sale of motor fuel in the State of Alabama and in this District under the Valero and Diamond Shamrock brand names.

51.    Defendant WilcoHess LLC ("WilcoHess") is a limited liability company formed under the laws of the State of Delaware with its principal place of business in Winston-Salem, North Carolina.

52.    At all times relevant to this Complaint, WilcoHess was engaged in the sale of motor fuel in the State of Alabama and in this District.

53.    Defendant BP Corporation North America, Inc. ("BP Amoco") is formed under the law of Indiana with its principal place of business in Indianapolis, Indiana.

54.    At all times relevant to this Complaint, BP Amoco was engaged in the sale of motor fuel in the State of Alabama and in this District.

8

## JURISDICTION AND VENUE

55.     Minimal diversity of citizenship exists between the parties.

56.     All Defendants regularly transact business within this State and within this District. The claims asserted in this Complaint arise from their business conducted within this State, including this District. Defendants are subject to the jurisdiction of this Court.

57.     The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

58.     This Court therefore has jurisdiction over this class action under 28 U.S.C. § 1332(d)(2).

59.     Venue is proper in this Court under 28 U.S.C. §1391(a)(2) because a substantial number of the transactions at issue in this action occurred in this District.

## FACTUAL BACKGROUND

### *Motor Fuels Are Purchased for the Energy They Provide*

60.     All engines whether internal combustion, diesel, rotary, jet, etc. harness energy by burning motor fuel to power planes, trains, automobiles, trucks, boats, motorcycles, and numerous other engine-driven devices like lawnmowers and generators. Accordingly, when Plaintiffs and class members buy motor fuels, they are quite literally buying energy. The energy content of motor fuels is measured and expressed in terms of British Thermal Units ("BTU").

### *The Physical Properties of Motor Fuel*

61.     Motor fuels are petroleum distillate liquids that expand and contract in response to changes in temperature. As a result, the volume of motor fuel (i.e., the amount of space it occupies) can vary radically even though the actual amount of fuel and resulting energy remains the same.

9

62.     When the temperature of motor fuel increases, the fuel expands and becomes less dense, thereby increasing in volume.  Conversely, as the temperature of motor fuel decreases, the fuel contracts and becomes more dense, decreasing in volume.  Accordingly, the same amount of motor fuel at a higher temperature will occupy a greater volume, taking up more space than it does at a lower temperature.

63.     When a "gallon" of motor fuel is defined volumetrically alone, without reference to temperature, the amount of liquid is said to occupy a volume of 231 cubic inches.  Due to the aforementioned physical properties of motor fuel, however, the amount of fuel that fills a 231 cubic inch space varies with the temperature of the fuel.

64.     At 60 degrees Fahrenheit, for example, a gallon of fuel does indeed measure 231 cubic inches of volume.  If that same gallon of fuel were heated to 90 degrees Fahrenheit, however, it would expand to occupy 235 cubic inches of volume.  Despite the increase in volume, the approximate 235 cubic inches of fuel at 90 degrees would still produce exactly the same amount of energy as the 231 cubic inches of fuel at 60 degrees.

65.     Because of the foregoing, a "gallon" defined volumetrically, without reference to temperature, is not a standard unit of measure.  Not surprisingly, therefore, trade usage in the petroleum industry defines a standard "gallon" unit of motor fuel volumetrically with reference to temperature, from the refinery down to the retailer.  Specifically, a "gallon" of motor fuel in the petroleum industry refers to an amount of motor fuel that occupies 231 cubic inches at a temperature of 60 degrees Fahrenheit.

66.     That petroleum industry standard is known as ASTM-IP D 1250, which defines a standard unit of measurement for a U.S. petroleum "gallon" as 231 cubic inches at 60 degrees

10

Fahrenheit. To provide certainty and predictability in petroleum transactions, ASTM-IP D 1250 has been widely adopted throughout the United States petroleum industry and various government agencies, including:

    a.    The United States Department of Treasury i.e., the Bureau of Customs, which requires imported petroleum products to be declared in gallons of 231 cubic inches at 60 degrees Fahrenheit;

    b.    The American Petroleum Institute, which has adopted the definition as a recommended industry standard, API 2540, also called D-1250;

    c.    The American Society for Testing and Materials, which has adopted D-1250 as the recommended industry standard;

    d.    The American National Standards Institute, which has adopted as the recommended industry standard, ANSI 711.83 which is D-1250; and

    e.    The Federal Trade Commission, which has adopted as a mandatory standard relating to packaged petroleum products the definition of a gallon of 231 cubic inches at 60 degrees Fahrenheit, 16 CFR, 500.8 (B).

67.    Despite the above-described industry-wide adoption of this standardized definition of a "gallon," Defendants have used, and continue to use, the nonstandard, non-temperature-adjusted definition of a "gallon" in their measurement of the motor fuel they have delivered, and continue to deliver, to Plaintiffs and class members.

### *The Petroleum Industry Profits from the Sale of Hot Motor Fuel to Consumers*

68.    Since motor fuel is temperature sensitive, there will be more

11

non-temperature-adjusted "gallons" of motor fuel in a warmer batch of motor fuel than there are in a cooler batch. Without temperature adjustment, in other words, consumers get less actual fuel per nonstandard "gallon" purchased as the temperature of that fuel increases.

69.    The foregoing can be expressed in terms of energy content, as well. Without temperature adjustment, customers get less actual BTU per nonstandard "gallon" purchased as the temperature of the fuel increases.

70.    Unlike members of the petroleum industry, who are sophisticated purchasers, most consumers are unaware that motor fuel is temperature sensitive. Sellers of fuel to consumers can thus profit from this informational asymmetry by selling motor fuel that is higher than 60 degrees Fahrenheit without adjusting back to the standard (i.e., 60 degree) gallon. This entire profit results solely from the increased temperature of the fuel and consumers' lack of information concerning the same.

71.    The average temperature of motor fuel sold annually in the United States, and, more specifically, in Alabama, exceeds 60 degrees Fahrenheit. Each year, therefore, the petroleum industry delivers to consumers substantially smaller quantities of motor fuel per nonstandard "gallon" than the industry would deliver if it measured deliveries of motor fuel to consumers by the industry standard "gallon" of 231 cubic inches of motor fuel at 60 degrees Fahrenheit.

72.    As a result, consumers in the United States collectively spend billions of dollars more each year to purchase the same quantity of motor fuel they would have received at advertised prices "per gallon" if the industry had adjusted that quantity according to the industry standard "gallon" as defined by ASTM-IP D 1250. The sellers of "hot" motor fuel are able to pocket these billions of additional dollars in temperature-inflated profits merely because the fuel they are selling is warmer

12

than 60 degrees Fahrenheit, and customers are ignorant of the truth.

### The Petroleum Industry's
### Inconsistent Stance on Temperature Compensation

73.     Technology has long been available that would ensure every gallon of motor fuel purchased by consumers contains the same quantity regardless of its temperature.   Such temperature-compensation equipment automatically adjusts each pumped gallon of motor fuel to provide a volume greater than 231 cubic inches when the temperature of the fuel exceeds 60 degrees Fahrenheit.  This increase in volume above 231 cubic inches corresponds directly to the increase in temperature above 60 degrees Fahrenheit.   Conversely, when the temperature drops below 60 degrees Fahrenheit, the temperature compensation equipment performs the same adjustment in reverse, decreasing the volume below 231 cubic inches in proportion to the decrease in temperature below the threshold of 60 degrees Fahrenheit.

74.     Nevertheless, because the petroleum industry profits from the sale of hot motor fuel to consumers at nonstandard, non-temperature-adjusted "gallons," the industry has repeatedly fought efforts to require the installation of temperature compensation equipment at retail fuel pumps in the United States.  Defendant retail sellers have refused to install such compensation equipment at their retail outlets.  And Defendant franchisors, who control the specifications of the fuel-dispensing devices at their franchisees' retail locations, routinely prohibit those franchisees from installing compensation equipment.

75.     Tellingly, the petroleum industry's position is precisely the opposite in Canada where the average temperature of motor fuel sold annually is less than 60 degrees Fahrenheit.

76.     If the petroleum industry were to measure its retail deliveries of motor fuel to

13

Canadian consumers by the same nonstandard "gallon" it uses for U.S. consumers, Canadian consumers would receive substantially larger quantities of motor fuel per nonstandard "gallon as compared to deliveries of motor fuel are measured by the industry standard "gallon" of 231 cubic inches of motor fuel at 60 degrees Fahrenheit.

77.    Stated succinctly, using the nonstandard "gallon" in Canada would benefit Canadian consumers at the expense of industry profits. For this reason, the petroleum industry has voluntarily implemented use of the industry standard "gallon" in Canadian retail sales through the voluntary and widespread use of temperature compensation equipment at retail pumps. The industry has further supported legislation in Canada requiring the installation of such compensation equipment at retail pumps.

78.    The inference from the petroleum industry's inconsistent stance on temperature compensation equipment should be clear. Where the sale of hot motor fuel allows the petroleum industry to earn higher profits, as in the United States, the industry opposes the installation of such equipment as being too costly. Where the sales of cold motor fuel reduce industry profits, as in Canada, the industry supports the use of such equipment.

### *Consumers and Competition*

79.    The industry-wide practice in the U.S. of selling nonstandard, non-temperature-adjusted motor fuel at the retail level has additional anti-competitive effects that benefit retailers, including Defendants, at the expense of consumers, including Plaintiffs and class members. These harms to consumers result because the temperature of fuel sold by Defendants varies significantly from retailer to retailer. As a result, the actual amount of fuel that a consumer obtains at a given price varies widely across retailers and purchases.

14

80.    The foregoing variance obscures the true price of motor fuel and raises the costs of ascertaining the true quantity, and thus the true price-per-gallon, of the motor fuel that consumers purchase.  Even where retailers provide temperature information on demand, obtaining such information is time consuming, creating significant opportunity costs for the consumer.  As a result, consumers are effectively precluded from making accurate price comparisons of retail motor fuel.

81.    Because consumers cannot make fully informed decisions about their motor fuel purchases, Defendants' refusal to sell standardized, temperature-adjusted motor fuel at the retail level foils consumer choice, thereby impairing the kind of basic competition that makes markets efficient.

### *Introduction to the Calculation of*
### *Fuel Taxes Remitted to Federal and Alabama Governments*

82.    The Defendants have exploited the physics of temperatures, mechanics of dispensing and quirks in tax laws to minimize their fuel taxes while collecting and keeping excessive moneys unjustly collected as "taxes" from consumers in Alabama.

83.    Federal and state fuel taxes are pre-collected at the supplier or wholesale level before the fuel ever reaches the point of purchase by the customer. Therefore, the Defendants initially pay fuel taxes to the government before the fuel is sold to the ultimate customer and then they reimburse themselves using fuel taxes collected from the customers at the point of purchase.

84.    Under federal law, the rate of tax is 18.3 cents per gallon. 26 U.S.C. 4081 (a)(2)(A)(i). Under federal regulations for purposes of calculating the taxes owed to the federal government, "[v]olumes of taxable fuel may be measured on the basis of actual volumetric gallons or gallons adjusted to 60 degrees Fahrenheit." 26 C.F.R. *5* 48.4081-8.

85.    Defendants are fuel distributors and suppliers. They also operate retail fuel

stations in the State of Alabama.

86.     The Defendants regularly pay taxes to Alabama and federal governments by calculating the amount due as if the fuel was 60 degrees Fahrenheit or cooler regardless of its actual temperature. This is known as calculating taxes on the "net gallons."

87.     Defendants regularly pay pre-collected fuel taxes calculated on the actual volume dispensed when the temperature is below 60 degrees, which measures at a lesser volume of fuel than when the fuel temperature is 60 degrees or above. However, when the fuel is dispensed by the Defendants at temperatures above 60 degrees, the amount of pre-collected fuel tax paid by the Defendants is calculated on an artificial volume of fuel that would exist if the fuel temperature was at 60 degrees instead of paying based on the actual greater volume. By operating in this manner, the Defendants always pay pre-collected fuel tax as though fuel was 60 degrees or cooler.

88.     Defendants have charged and collected from Plaintiffs and the Class purported federal, state, and local fuel "taxes" based on the actual volume of fuel dispensed at the pump regardless of the temperature of the fuel. Thus, Plaintiffs and the Class have paid moneys as purported "taxes" to Defendants based on the "gross gallons" of fuel purchased, not the "net gallons."

89.     As a result of this fuel "tax" collection scheme, the Defendants pay pre-collected taxes based on a lower volume of fuel than actually sold to customers, but collect fuel taxes on the higher volume of fuel actually sold to their customers. As such, the Defendants are reaping a windfall because customers are paying more purported "taxes" to Defendants than the Defendants actually pay to the federal, state, and local governments for fuel taxes.

16

90.     The Defendants represent that the purported "taxes" charged at the pump are being passed through to the state, local, and federal governments as fuel "taxes," when in reality Defendants are collecting more for "taxes" from customers than they are paying to the governments. This additional money collected under the guise of "tax" is instead profits for Defendants.

## CLASS ACTION ALLEGATIONS

91.     Plaintiffs bring this action on behalf of all persons who purchased motor fuel at a temperature greater than 60 degrees Fahrenheit from one or more of the Defendants in the State of Alabama.  Excluded from the class are all officers and directors of the Defendants, their parents, subsidiaries and affiliates, any law firm or attorney of record in this matter and any judge who presides over this case.

92.     The class is so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown, Plaintiffs believe that the proposed class would include millions of customers.

93.     There are questions of fact and law common to all class members, including:

    a.     Whether the Defendants routinely sell motor fuel to consumers at temperatures substantially above 60 degrees Fahrenheit;

    b.     Whether "gallon," as that term is used in the retail sale of motor fuel, is a standard unit of measure that has a recognized and permanent value such that the amount of motor fuel in one gallon does not vary, and is always the same, in every gallon;

    c.     Whether the Defendants' practice of measuring motor fuel delivered in retail

17

sales transactions by a nonstandard, non-temperature-adjusted "gallon" is an "unfair practice;"

d.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" is a "fraudulent practice;"

e.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" is a "deceptive practice;"

f.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" is an "unlawful practice;"

g.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" is an "unconscionable practice;"

h.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" has harmed Plaintiffs and class members;

i.    Whether the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" should be enjoined;

j.    Whether the Defendants should be required to make Plaintiffs and class members whole for any harm caused by the Defendants' practice of

measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon," and if so, in what amount.

94.     The common questions of fact or law are central to the adjudication of this action and predominate over any issues affecting only individual members.

95.     Plaintiffs' claims are typical of the claims of the class because Plaintiffs are members of the proposed class, their claims have the same essential characteristics as the claims of class members, their claims arise from the same general course of conduct that gives rise to claims of all class members, and their claims are based on the same legal theories as those of all other class members.

96.     A trial of this matter will therefore be manageable if it is certified as a class action.

97.     Plaintiffs will fairly and adequately protect the interests of the members of the class.

98.     Plaintiffs will adequately represent the plaintiff class because they have no interest that is adverse or antagonistic to the interests of absent class members.

99.     Plaintiffs have retained counsel who have substantial experience and success in the prosecution of complex class action and consumer-protection litigation.

100.    The expense of prosecuting Plaintiffs and class members' claims individually would significantly exceed any economic benefit Plaintiffs or class members could realize individually, thus making individual litigation of their claims economically impractical and infeasible. Accordingly, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

101.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which

19

would establish incompatible standards of conduct for the Defendants.

102.    The Defendants have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT

103.    Plaintiffs incorporate each of the above allegations by reference as if fully rewritten herein.

104.    Plaintiffs bring this Count on behalf of all persons who purchased hot motor fuel from any of the Defendants in the State of Alabama.

105.    Motor fuel is a good under the Alabama Deceptive Trade Practices Act.

106.    The advertising, offering for sale and sale of motor fuel is trade, commerce, or a consumer transaction under the Alabama Deceptive Trade Practices Act.

107.    The Defendants violated and continue to violate the Alabama Deceptive Trade Practices Act by engaging in the following unconscionable, false, misleading or deceptive acts or practices in connection with the sale or advertisement of hot motor fuel, all of which were false or had the capacity to deceive:

    a.    Delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

    b.    Representing to Plaintiffs and class members motor fuel unit prices in terms of the standard unit of a "gallon," when in fact Defendants deliver

20

nonstandard "gallons" of motor fuel measured volumetrically without reference to temperature;

c.     Delivering to Plaintiffs and class members less motor fuel than Defendants agreed to deliver when the temperature of the motor fuel exceeded 60 degrees Fahrenheit;

d.     Representing that hot motor fuel has characteristics, uses, benefits, or quantities which it does not have.

108.   The Defendants violated and continue to violate the Alabama Deceptive Trade Practices Act by engaging in the following unconscionable, false, misleading or deceptive acts or practices in connection with the sale or advertisement of hot motor fuel, all of which had the capacity to deceive:

a.     Concealing, suppressing and omitting that Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit;

b.     Concealing, suppressing and omitting that the standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit;

c.     Concealing, suppressing and omitting that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon;

d.     Concealing, suppressing and omitting that the energy content of motor fuel

sold by the Defendants varies according to its temperature;

    e.    Concealing, suppressing and omitting that the term gallon used by the Defendants in the sale of motor fuel to consumers at the retail level of distribution is not a standard unit of measure;

    f.    Failing to disclose information concerning motor fuel, as stated above, which was known at the time of the transaction where such failure to disclose such information was intended to induce Plaintiffs and class members into retail sale transactions into which Plaintiffs and class members would not have entered had the information been disclosed.

109.    The Defendants intended that Plaintiffs and class members would rely on the Defendants' concealments, suppressions or omissions in the purchase of hot motor fuel.

110.    Plaintiffs and class members relied on Defendant's false, misleading or deceptive acts or practices.

111.    The Defendants, by engaging in the foregoing conduct, took advantage of Plaintiffs and class members' lack of knowledge, ability, experience or capacity to a grossly unfair degree.

112.    Plaintiffs and class members sustained actual damages, the producing cause of which was the Defendants' unconscionable or deceptive acts or practices, because they received less motor fuel than they were entitled to receive and for which they paid.

113.    Defendants' sale of hot motor fuel and their unconscionable and deceptive acts and practices in connection therewith was and is reckless, shows spite or ill will or demonstrates a reckless indifference to the interests of consumers.

114.    Defendants' conduct has further injured Plaintiffs and class members by impairing

competition within retail motor fuel markets and preventing Plaintiffs and class members from making fully informed decisions about the motor fuel they purchase.

115.    Plaintiffs respectfully request that this Court enjoin Defendants from engaging in the unlawful conduct alleged herein; require the Defendants to install temperature correcting equipment on their retail motor fuel dispensing devices or require Defendants to post conspicuous notice on their retail motor fuel dispensing devices notifying consumers of the temperature at which the motor fuel is being sold and the effect of temperature on the energy content of motor fuel; require Defendants to notify all affected persons of the Court's injunction; declare that selling motor fuel in nonstandard gallons or at temperatures above 60 degrees Fahrenheit without volume adjustment violates the Alabama Deceptive Trade Practices Act; award monetary damages incidental to the requested injunctive or declaratory relief; and award Plaintiffs and/or class members a reasonable attorneys' fee and award such other relief as the Court may deem just and proper.

## COUNT II

## BREACH OF CONTRACT

116.    Plaintiffs incorporate each of the above allegations by reference as if fully rewritten herein.

117.    Motor fuels are "goods" under applicable commercial law.

118.    Retail transactions for the sale of motor fuel between Defendants-sellers and Plaintiffs-buyers are contracts for the sale of goods under applicable commercial law.

119.    Defendants-sellers are "merchants" and Plaintiffs-buyers and class members are not merchants under applicable commercial law.

120.    Pursuant to applicable commercial law, the "agreement" between Plaintiffs-buyers

23

and Defendants-sellers is the "bargain of the parties in fact, as found in their language or inferred from other circumstances, including ... usage of trade...."

121.    Plaintiffs-buyers and class members purchased motor fuel from Defendants-sellers at their retail outlets.

122.    Each time a Plaintiff or a class member contracted to purchase motor fuel from the Defendants, the parties agreed that the Plaintiff or class member would pay a specified price for and that the Defendants would deliver a unit of measure expressed in "gallons."

123.    Because the parties agreed to the sale of motor fuel by a standard unit of measure expressed in gallons, and because in commercial practice a sale of a commodity in terms of a specified price per standard unit of measure has come to mean that such units are fungible (which is to say freely interchangeable), the Plaintiff and class members were, under the circumstances, reasonable in expecting that the Defendants had agreed to deliver fungible gallons of motor fuel such that one unit of the same kind or grade would be freely interchangeable with any other like unit of the same kind or grade of motor fuel.

124.    Consequently, each time a Plaintiff or class member and one of the Defendants made a contract for sale of motor fuel, the parties agreed that the Plaintiff or class member would pay a specified price for and the Defendants would deliver a unit of measure which has a recognized and permanent value, such that the amount of motor fuel contained in that standard unit would not vary and would always contain the same amount of motor fuel.

125.    None of the Plaintiffs' or any class member's agreements with Defendants for the purchase of motor fuel included an express definition of "gallon."

126.    Because a "gallon" defined by volume without reference to temperature is not a

24

standard unit of measure, such a volumetric gallon was not the meaning of a "gallon" intended by the parties in their agreements for the sale of motor the at a specified price per gallon.

127.    In other words, the Plaintiffs or any class member could reasonably expect from the language and the circumstances that "gallon" was defined in the agreement with reference to volume and temperature.

128.    In the motor fuel industry, a regularly observed industry standard definition of "gallon" is that amount of motor fuel which occupies 231 cubic inches when its temperature is sixty degrees Fahrenheit.

129.    In other words, the industry standard definition of "gallon" measures the amount of fuel by both volume and temperature and qualifies as a standard unit of measure.

130.    Because of the regularity of observance in the petroleum industry of the industry standard definition of "gallon" and because there is no other standard "gallon" unit commonly used to measure quantities of motor fuel, each time the Plaintiffs and class members agreed to purchase motor fuel at a specified price per gallon, they could reasonably expect that the Defendants agreed to the sale of motor fuel at a specified price per industry standard gallon.

131.    In other words, the Plaintiffs and any class member could reasonably expect that the Defendants would deliver that amount of motor fuel which occupies 231 inches when its temperature is sixty degrees Fahrenheit.

132.    In addition or alternatively, although there was no express definition of "gallon" in the agreement, Plaintiffs and class members could, under the circumstances, reasonably expect that "gallon" meant a standard unit of measure and that meaning excluded any definition of "gallon" that measured by volume but not temperature.

25

133.    In other words, the industry standard definition of "gallon" qualifies as a standard unit of measure because it measures the amount of motor fuel by both volume and temperature.

134.    Because the agreement does not adjust the price or volume of motor fuel for changes in temperature and motor fuel is sold at a temperature in excess of 60 degrees Fahrenheit, the unadjusted amount of motor fuel delivered at the pump is inconsistent with the standard unit of measure agreed to by the parties.

135.    Because the parties have not agreed on a method of adjusting the price and volume of motor fuel for changes in temperature and such a term is essential to the determination of their rights and duties, the court should supply an adjustment term which is reasonable in the circumstances.

136.    A term which is reasonable in the circumstances is the industry standard definition of "gallon" which measures motor fuel by the volume it occupies when its temperature is sixty degrees Fahrenheit.

137.    Each time Defendants delivered motor fuel to a Plaintiff or a class member, they delivered "gallons" (and/or fractions thereof) of motor fuel as measured volumetrically without reference to temperature.

138.    Each time Defendants delivered motor fuel to a Plaintiff or a class member in "gallons" (and/or fractions thereof) measured volumetrically without reference to temperature, the amount of motor fuel Defendants delivered per "gallon" (and/or fractions thereof) varied depending upon the temperature of the motor fuel.

139.    As a result, each time Defendants delivered motor fuel to Plaintiffs or to a class member when the temperature of the motor fuel was greater than sixty degrees Fahrenheit, Defendants delivered less motor fuel to Plaintiffs and class members than that for which Plaintiffs

26

or class members paid and were entitled to receive and less motor fuel than Defendants were contractually required to deliver.

140.    Consequently, each time Defendants delivered motor fuel to a Plaintiff or to a class member when the temperature of the motor fuel was greater than sixty degrees Fahrenheit, Defendants breached their contracts for sale of motor fuel with Plaintiffs and class members.

141.    Plaintiffs and class members performed their obligations under the contracts.

142.    Each Defendant received notice of breach of contract and breach of express and implied warranty pursuant to UCC 2-607(3) in Alabama for all transactions involving the retail sale of non-temperature adjusted motor fuel (diesel and gasoline), as well as notice that retail customers sustained, and continue to sustain damages by paying extra money for expanded hot fuel which provides no additional energy.

143.    Defendants' breach of contract proximately caused Plaintiffs and class members to sustain substantial losses in an amount to be proved at trial because Plaintiffs and class members received less motor fuel and less energy than they were entitled to receive under the sale contracts.

## COUNT III
## FRAUDULENT CONCEALMENT OF TAXES

144.    Plaintiffs incorporate each of the above allegations by reference as if fully rewritten herein.

145.    Defendants publicly represented that certain moneys of every actual gallon of gasoline or diesel sold to consumers were being remitted to the federal, state, and local governments as fuel "taxes" when, in fact, Defendants were and are retaining a significant portion of those moneys collected from Plaintiffs and the Class as purported "taxes."

27

146.    Defendants omitted and failed to provide information on the method taxes are paid by them as pre-collected fuel tax to the governments and that they are actually profiting from the so called fuel "taxes" that consumers are charged.

147.    As a result of the fraudulent concealment engaged in by Defendants, Plaintiffs and the Class sustained an ascertainable loss of money in that they paid money to Defendants for what was represented to them to be pass through federal, state, and local fuel taxes when Defendants were and are actually keeping a portion of the money represented to be for fuel "taxes."

148.    The Plaintiffs and Class suffered damages in an amount equal to the total amount of federal, state, and local fuel taxes collected by Defendants from the Plaintiffs and the Class less the amount actually remitted to federal, state, and local governments as fuel taxes.

149.    Defendants knew that a significant portion of the moneys they were collecting from Plaintiffs and Class under the guise of federal, state, and local fuel "taxes" were, in fact, not being remitted to the federal, state, and local governments, but were simply being collected as part of Defendants' general revenue.

150.    Plaintiffs and the Class seek all remedies and damages authorized under Alabama law for Defendants' fraudulent concealment, including actual damages, punitive damages, attorneys' fees and costs of this action.

### COUNT IV

### FRAUDULENT CONCEALMENT OF FUEL QUANTITY DELIVERED

151.    Plaintiffs incorporate each of the above allegations by reference as if fully rewritten herein.

28

152.    Defendants are delivering to Plaintiffs and class members motor fuel substantially in excess of 60 degrees Fahrenheit. The standard U.S. Petroleum Gallon in the motor fuel industry at all levels of distribution except the retailer-to-consumer level of distribution is 231 cubic inches at 60 degrees Fahrenheit.

153.    Defendants fraudulently concealed that each volumetric gallon of hot motor fuel sold by the Defendants at the retail level contains less motor fuel than the standard U.S. Petroleum Gallon.

## COUNT V

## CONVERSION OF MONEYS WHICH BELONG TO THE PLAINTIFFS AND THE CLASS AGAINSTALL DEFENDANTS

154.    Plaintiffs incorporate each of the above allegations by reference as if fully rewritten herein.

155.    Plaintiffs and the Class were and are the sole and rightful owners of the windfall of moneys collected by Defendants as purported federal, state, and local "taxes" which exceeded the actual amount of moneys remitted as fuel taxes by Defendants to federal, state, and local governments.

156.    Defendants further converted moneys rightfully owned by the plaintiffs and the class when defendants charged plaintiffs and the class for "gallons" of fuel which, in fact, when dispensed at above 60 degrees Fahrenheit did not meet the industry standard definition of "gallon" (i.e. there was no temperature compensation).

157.    The moneys due and owing to Plaintiffs and the Class are now in the possession

29

and under the control of Defendants. Defendants have taken these moneys for their own use and benefit, thereby permanently depriving Plaintiffs and the Class of the use and benefit of such moneys.

158.    There is clear and convincing evidence that the Defendants' actions showed willful misconduct, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences

159.    Defendants acted willfully, wantonly, with oppression, and with a conscious disregard of the rights of Plaintiffs and the Class, such that Plaintiffs request that the trier of fact award punitive damages in sufficient amounts to punish Defendants for their conduct.

160.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class have, and will continue to, suffer compensatory damage in an amount to be determined according to proof at the time of trial.

161.    By virtue of Defendants' actions, Defendants hold a windfall of moneys as constructive trustee for the benefit of the Plaintiffs and the Class. Plaintiffs request an order that Defendants be directed to give possession of such windfall to the Plaintiffs and the Class.

## COUNT VI

## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

162.    Plaintiffs incorporate each of the above allegations by reference as if fully rewritten herein.

163.    Plaintiffs and the Class conferred a monetary benefit on Defendants in an amount equal to the difference between the amount of purported federal fuel "taxes" collected from Plaintiffs and the Class and the amount of federal fuel taxes actually paid to the federal

30

government by Defendants (hereinafter sometimes referred to as the "federal fuel tax windfall").

164.    Defendants accepted and retained the federal fuel tax windfall.

165.    Defendants' acceptance and retention of the federal fuel tax windfall was and is under circumstances in which Defendants were and are unjustly enriched to Plaintiffs' and the Class's detriment.

166.    Plaintiffs and the Class were damaged in the amount of the federal fuel tax windfall conferred to Defendants as set forth herein.

167.    Plaintiffs and the Class also conferred a monetary benefit on Defendants in an amount equal to the difference between the amount of purported Alabama state and local fuel "taxes" collected from Plaintiffs and the Class and the amount of state and local fuel taxes actually owed and paid by the Defendants to state and local governments (hereinafter sometimes referred to as the " Alabama state fuel tax windfall").

168.    Defendants accepted and retained the Alabama state fuel tax windfall.

169.    Defendants' acceptance and retention of the Alabama state fuel tax windfall was and is under circumstances in which Defendants were unjustly enriched to the Plaintiffs' and the Class's detriment.

170.    Plaintiffs and the Class were damaged in the amount of the Alabama state fuel tax windfall conferred to Defendants as set forth herein.

171.    Defendants have been unjustly enriched by the federal and state fuel "tax" windfall.

172.    Defendants have received money which the Plaintiffs and the Class are entitled to recover and which the Defendants are not entitled to retain in good conscience.

31

173.    Under the principles of equity and under the theory of unjust enrichment, Plaintiffs and the Class are entitled to restitution from Defendants in the amount of the federal and state fuel "tax" windfall.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiffs and Class members pray for judgment against the Defendants, and each of them, as follows:

1.    For general damages in an amount according to proof at trial and beyond the jurisdictional minimum of this Court.

2.    For economic losses in an amount according to proof at trial;

3.    For injunctive and/or declaratory relief;

4.    For punitive damages;

5.    For costs of the suit herein;

6.    For applicable statutory interest as provided by law;

7.    For any available attorneys' fees; and

8.    For such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

174.    Plaintiffs request trial by jury on all issues so triable.

DATED:

Respectfully submitted,
GIRARDI | KEESE

By:
J. PAUL SIZEMORE
Attorneys for Plaintiffs
State Bar No. ASB 9286 077J

```
Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602000208
Cashier ID: khaynes
Transaction Date: 08/23/2007
Payer Name: GIRARDI AND KEESE
-----------------------------------
CIVIL FILING FEE
 For: GIRARDI AND KEESE
 Case/Party: D-ALM-2-07-CV-000750-001
 Amount:        $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 133106
 Amt Tendered:  $350.00
-----------------------------------
Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00

S. GARRETT COOK ET AL V. HESS CORP
ET AL
```